IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GARY W. BOWLING, )
)
Plaintiff, )
)
v. ) 1:19CV536
)
ANDREW SAUL, )
Commissioner of Social Security,[1] )
)
Defendant. )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Gary Bowling ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on September 11, 2015, alleging a disability onset date of January 30, 2013 in both applications. (Tr. at 16, 238-39.)[2] His

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #8]. It does not appear that Plaintiff's application for SSI is included in this record. However, its omission has no bearing on the outcome of Plaintiff's case.

applications were denied initially (Tr. at 81-106, 135-42) and upon reconsideration (Tr. at 107-34, 148-64). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 165-66.) On March 19, 2018, Plaintiff, along with his attorney, attended the subsequent hearing, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 16, 32-79.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 26), and, on April 24, 2019, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. <u>LEGAL STANDARD</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

2

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

Case 1:19-cv-00536-NCT-JEP   Document 15   Filed 09/11/20   Page 3 of 17

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work;" if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 18.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative disc disease; carpal tunnel syndrome; morbid obesity; diabetes; and hypertension[.]

(Tr. at 18.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 19-21.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he could perform sedentary work with the following, further limitations:

> he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. [Plaintiff] cannot climb ladders, ramps, or stairs. He can occasionally push, pull, and operate foot controls with the bilateral lower extremities.

5

> [Plaintiff] can frequently handle and finger with the right dominant upper extremity. In addition, he cannot work in hazardous environments such as at unprotected heights, around dangerous machinery, and around open flames.

(Tr. at 21.)[5] Based on this determination, the ALJ found at step four of the analysis that Plaintiff could not perform any of his past relevant work. (Tr. at 24.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 25-26.)

Plaintiff now challenges the ALJ's decision in two respects. First, he argues that substantial evidence fails to support the ALJ's finding that Plaintiff can frequently handle and finger with his right dominant upper extremity. (Pl.'s Br. [Doc. #12] at 6-12.) Second, Plaintiff asserts that the ALJ failed to properly account for Plaintiff's functional illiteracy when identifying his education level, and that this error resulted in flawed vocational expert testimony at step five of the sequential analysis. (Id. at 12-16.) After a thorough review of the evidence, the Court finds that Plaintiff's first contention merits remand.

Plaintiff injured his right hand in an ATV accident in 2008. (Tr. at 365, 417, 589, 596.) He reported that the hand was casted several months later, but he removed the cast after two weeks so that he could return to work, and he experienced increasing pain and functional difficulties which, along with back pain and other impairments, led him to stop working in 2012. (Tr. at 46-49, 417, 589, 596, 607-08.) Both at the time of his consultative examination

---

[5] The RFC, as set out in the ALJ's decision, provides that Plaintiff can climb ramps and stairs both occasionally and never. Plaintiff does not challenge this discrepancy, and it appears from the hearing transcript that the error is typographical. In his hypothetical question to the vocational expert, the ALJ describes an individual who "[c]an only occasionally climb ramps or stairs" and who "[c]annot climb ladders, ropes[,] or scaffolds." (Tr. at 75.)

in 2015 and at his hearing in 2018, Plaintiff reported significant difficulties in performing basic daily activities with his right hand, including holding and gripping items such as utensils, turning doorknobs, bathing, dressing, showering, shaving, and toileting. (Tr. at 46-49, 58, 416, 589.) In fact, he reported needing help from his niece to perform nearly all of these activities. (Tr. at 58, 416, 589.)[6] Although the ALJ's decision mentions Plaintiff's allegations of "hand numbness/cramping," and "problems . . . holding/gripping," it makes no mention of Plaintiff's 2008 injury, the specific limitations mentioned by Plaintiff, or their alleged extent. (Tr. at 21.) Moreover, none of the impairments included at step two of the sequential analysis, severe or non-severe, appear to relate to Plaintiff's hand injury. (Tr. at 18.) Instead, the ALJ appears to attribute Plaintiff's hand problems entirely to carpal tunnel syndrome.

This omission would be of no moment had the ALJ considered the effects of Plaintiff's injury at later steps of the sequential analysis. However, as Plaintiff discusses at length in his brief, the ALJ's treatment of the evidence as a whole in determining Plaintiff's RFC, and specifically in his treatment of the medical opinion provided by the consultative examiner, Dr. Steven Landau, demonstrates that he did not. Dr. Landau examined Plaintiff on December 22, 2015, and found, as recounted in the ALJ's decision, that Plaintiff's symptoms, including "decreased finger/thumb range of motion . . . and wrist tenderness," produced "difficulty with activities such as right-sided rapid alternative hand movement." (Tr. at 22.) Specifically, with respect to Plaintiff's right hand, Dr. Landau reported and found as follows:

> **Chief Complaints:** . . . dislocated bone in the right wrist status post ATV accident, numbness in both hands . . . .

---

[6] The Social Security application form also notes that, "Claimant's signature is difficult due to hand dislocation." (Tr. at 274.)

7

**Activities of Daily Living:** He can bathe with help and dress with help, and he needs help to wipe himself after going to the bathroom. He is able to make sandwiches and watch television. . . .

**Past Medical History:** He has been getting worse for six months. He was in Kentucky and doing poorly and his niece brought him here to North Carolina. He had an ATV accident eight years ago, while riding to the store, and handlebar hit his right hand, which caused a dislocation of one of the bones in the hand. It was casted and repaired. In the end it would be a good idea to retrieve his x-rays, or to get new x-rays of his right hand. . . .

**Physical Examination:** . . . . He is cooperative and the findings appeared fairly valid. He is not able to tie his shoes. He can do fine motor activities with his left hand, but not with his right hand. . . . Rapid alternating movements of the hands are intact on the left, and he has marked difficulty with the right side. Finger to thumb is normal on the left and he is unable to do it on the right. . . . The right index finger shows contractures, and this is flexion at the metacarpophalangeal joint of 20-90 degrees, flexion of the proximal interphalangeal joint is 20-100 degrees, flexion at the distal interphalangeal joint is 20-70 degrees. . . . There is a lump in his right dorsal radial wrist, which is somewhat tender. It measures 2-3 centimeters and corresponds to what I would expect a dislocated bone would be. His right fingers clench involuntarily and he cannot really straighten them out. He is almost making a fist constantly. Tinel's sign is positive bilaterally. . . . Motor strength was 5/5 on the left upper extremity . . . and 2+/5 on the right hand. . . . Decreased light touch and pinprick on the right hand, otherwise grossly intact throughout upper and lower extremities. . . .

**Diagnoses:** . . . 2. Dislocation of the carpal bone in his right wrist with involuntary hand contraction and spasm. 3. Carpal tunnel syndrome bilaterally. . . .

**Functional Assessment/Medical Source Statement:** . . . . Manipulative Activities: Reaching overhead is unlimited on the left, and occasionally on the right due to constant cramping, bearing in mind that he may not be able to hold onto anything with his right hand. . . . Handling is frequently on the left, with avoidance of repetitive activities due to carpal tunnel syndrome. Handling is occasionally to never on the right due to hand spasm and dislocated bone. Fingering would be occasionally on the left and never on the right due to carpal tunnel on the left and constant spasm on the right. Feeling is occasionally on the right due to decreased sensation, and unlimited on the left.

(Tr. at 416-21.)

Similar findings are reflected in the medical record. A 2015 note from Plaintiff's primary care provider in Kentucky notes, "Rt index finger deformed," with an assessment of: "Rt index finger dislocated." (Tr. at 351.) At Plaintiff's initial assessment with his primary care provider in North Carolina in August 2015, the provider noted on examination, "Right wrist with decreased [range of motion] and malaligned index finger." (Tr. at 413.) A 2016 note from that provider reflects on examination of the extremities: "Contracture of right hand." (Tr. at 442.) An examination note from his pain management provider reflects, "index and second finger slightly contracted from previous injury." (Tr. at 462.) Finally, examination notes from the Novant Hand and Upper Extremity Center in 2017 reflect:

> Index finger rotation so it's overlapping middle finger when making fist or extended
> Tenderness to palpation over base of 2nd metacarpal
> Tenderness to palpation over STT, not TFCC
> . . . .
> Subluxed 2nd MCP
> Somewhat tender to palpation
> Cyst on dorsal middle finger PIP – nontender to palpation
> Index finger with malrotation, crossing middle finger

(Tr. at 597, 608.)

These issues are also reflected in x-rays and a later CT scan of Plaintiff's right hand. X-rays from January 2016 reflect:

> **Findings:** Flexion deformity is seen involving the second through fifth digits of the right hand. No significant underlying bony abnormality is identified. The left hand is normal in appearance.
> **Impression:** Flexion deformity of the right fingers.

(Tr. at 424.) A subsequent x-ray in 2017 showed "significant sclerosis at the 2nd MCP joint and ulnar positive." (Tr. at 597.) Nerve conduction studies also showed severe carpal tunnel

9

syndrome on the right, and Plaintiff underwent carpal tunnel release surgery. (Tr. at 611-14, 631.) A subsequent CT scan reflected:

> 1. Negative for acute fracture.
> 2. Cortical irregularity possibly due to old healed fracture and secondary degenerative change at the base of the 2nd intercarpal with relative dorsal subluxation of the 2nd metacarpal at the CMC joint.
> 3. Small effusions of the MCP joints possibly inflammatory or crystalline arthritic in nature.
> 4. Possible osteochondral abnormality or erosion of the palmar articular surface of the 3rd metacarpal with apparent small erosions or intraosseous ganglion of the 4th metacarpal and ulnar styloid.
> 5. Apparent postsurgical changes of the carpal tunnel with scarring and/or edema about the site of previous carpal retinaculum and mild fluid of the carpal tunnel about the median nerve.

(Tr. at 630.) As summarized by Plaintiff's hand surgeon, the scan showed "persistent subluxation and arthritis of the second CMC joint." (Tr. at 632.)

The ALJ nevertheless found that Plaintiff could "frequently handle and finger with the right dominant upper extremity." (Tr. at 21.) In reaching this conclusion, the ALJ first summarized the January 2016 x-rays, and noted that Plaintiff's "left hand was normal and there were no underlying bony abnormalities on the right" with only "mild degenerative changes." (Tr. at 22 (internal quotations omitted).) However, the analysis of Plaintiff's left wrist has no bearing on the impairment to his right hand, and the ALJ's analysis fails to consider the 2017 x-rays and CT scans, and fails to fully consider the impact of the flexion deformity of the right fingers reflected in the January 2016 x-ray.

The ALJ next generally reviewed the physical examination records but did not discuss the examination records noted above with respect to Plaintiff's right hand deformity. The ALJ also summarized Dr. Landau's examination report, but rejected the limitations reflected there in the following analysis:

10

> A physical examination performed by Dr. Landau described symptoms that would likely limit the claimant's functioning, including slightly limited hip flexor strength, decreased finger/thumb range of motion, and wrist tenderness. (6F/5) The claimant also had difficulty with activities such as right-sided rapid alternative hand movement and tandem, heel, and toe walking (6F/3).
>
> However, Dr. Landau's evaluation also described "nearly normal" gait, intact rapid alternating left hand movements, 5/5 left upper extremity strength, generally intact upper/lower extremity sensation, and normal range of motion in the cervical spine, shoulders, elbows, ankles, and feet. . . . Further, the claimant's record also described improved symptoms with treatment, including following carpal tunnel surgery; in fact, according to treatment notes, the claimant had "noticeable improvement" in his symptoms from preoperative levels (16F/51). The claimant also noted improved symptoms with medication, including Gabapentin and hydrocodone (15F/98, 16F/19).

(Tr. at 22.) In discussing Dr. Landau's opinion later in his decision, the ALJ made similar findings:

> Dr. Landau limited [Plaintiff] to light work with the following limitations; he can occasionally balance, stoop, kneel, crouch, crawl and climb ramps/stairs but never climb ladders ropes, or scaffolds. He also limited [Plaintiff's] manipulative abilities including <u>occasionally overhead reaching, handling, fingering, and holding with the right hand</u>. The undersigned assigned this opinion partial weight. While the evidence supports the postural limitations discussed above, given new evidence received at the hearing level showing improved symptoms following carpal tunnel [surgery], the undersigned limited [Plaintiff] to frequent handling and fingering. There was no evidence that [Plaintiff] would have significant reaching limitations, as the evidence showed normal shoulder range of motion. Further, given additional evidence received at the hearing, including treatment notes and [Plaintiff's] testimony, the undersigned determined that [Plaintiff's] impairments would limit him to sedentary work as opposed to light.

(Tr. at 23 (emphasis added) (internal citations omitted).)

However, the Court notes first that the ALJ misstated Dr. Landau's opinion regarding Plaintiff's handling and fingering abilities. Specifically, the ALJ stated that Dr. Landau limited Plaintiff's manipulative abilities to "occasional[] overhead reaching, handling, fingering, and holding with the right hand." (Tr. at 23.) However, while Dr. Landau did limit Plaintiff to

11

occasional reaching, it was based on "constant cramping, bearing in mind that he may not be able to hold onto anything with his right hand," and Dr. Landau's assessment did not include occasional handling and fingering, but instead reflected handling "occasionally to never on the right due to hand spasm and dislocated bone" and fingering "occasionally on the left and <u>never on the right</u> due to carpal tunnel on the left and constant spasm on the right." (Tr. at 421 (emphasis added).)

Moreover, to the extent ALJ relied on "intact rapid alternating <u>left</u> hand movements, 5/5 <u>left</u> upper extremity strength," and "normal range of motion in the cervical spine, shoulders, [and] elbows," those findings would not affect the determination regarding Plaintiff's right hand injury and resulting deformity. To the extent the ALJ cited Plaintiff's improvement following carpal tunnel surgery, the ALJ relied on Plaintiff's treatment notes from a single appointment on November 21, 2017, less than two weeks post carpal tunnel surgery, reflecting a post-surgery visit with the provider noting:

> [Plaintiff] returns today Status post right carpal tunnel release. He is doing well he said noticeable improvement in his symptoms from preoperative. He's had no problems with his wound or draining, swelling improving with pain.

(Tr. at 621.) Nevertheless, as Plaintiff testified at his hearing, any improvement was short-lived. (Tr. at 71-72.) On December 20, 2017, just six weeks post-surgery, Plaintiff returned to his physician reporting continuing "right hand pain and soreness over his right palm." (Tr. at 626.) This is consistent with Plaintiff's hearing testimony that, after his surgery, "the pain never changed, [although] the numbness and tingling . . . subsided a little bit," and that he couldn't say if his pain was from the carpal tunnel or his previous hand injury. (Tr. at 71.) The provider noted "minimal improvement in sensation in the [right] hand at this point," with

Case 1:19-cv-00536-NCT-JEP   Document 15   Filed 09/11/20   Page 12 of 17

the ability "to make full fist with all digits except index finger." (Tr. at 626-27.) The provider ordered a CT scan "to assess whether any further surgery would improve the functionality of the hand." (Tr. at 627.) The results of the CT scan are set out above, and showed "persistent subluxation and arthritis of the second CMC joint" which the surgeon recommended treating surgically via a "second carpometacarpal fusion with staples." (Tr. at 632.) At the hearing, Plaintiff testified that this fusion surgery was scheduled for April 12, 2018. (Tr. at 72.) Although provided with all of this evidence, the ALJ failed to mention Plaintiff's continuing, non-carpal-tunnel hand issues in his decision and instead focused entirely on the single treatment note indicating the "success" of Plaintiff's carpal tunnel release surgery.[7]

Finally, the ALJ also noted "improved symptoms with medication, including Gabapentin and hydrocodone." (Tr. at 22.) However, Plaintiff was taking Gabapentin and hydrocodone or oxycodone at the time of Dr. Landau's examination and throughout the treatment notes set out above. Moreover, the ALJ cites two treatment notes in support of this finding. The first is a progress note from the Pain Management Clinic from November 14, 2017 regarding Plaintiff's back, right wrist, and knee pain, and notes that medications provide "mild pain relief and improvement of function," but, "[t]he patient has continued pain despite conservative and medical management," and he requires assistance with bathing, dressing,

---

[7] As noted by Plaintiff in the briefing, even if the carpal tunnel release surgery had affected the limitations related to Plaintiff's injury and deformity, Plaintiff's carpal tunnel release surgery took place on November 9, 2017, nearly five years after Plaintiff's alleged onset date, nearly two years after his date last insured, and just months before his administrative hearing. In identifying the surgery as the sole basis for departing from Dr. Landau's opined handling and fingering limitations, the ALJ fails to account for Plaintiff's RFC during the preceding five years of alleged disability. Plaintiff therefore argues that, even if substantial evidence supports Plaintiff's ability to perform frequent handling and fingering with his right hand after his November 2017 surgery, the ALJ erred in failing to consider whether a closed period of disability would be appropriate in the present case. (Pl.'s Br. at 8-9.)

13

grooming and toileting. (Tr. at 555.) The second treatment record cited by the ALJ is a record of Plaintiff's primary care physician from July 24, 2017, reflecting:

> The patient presents today for evaluation of his chronic right hand pain. The patient is followed by the pain clinic in Elkin, on hydrocodone. He has had increased pain, stiffness, swelling, numbness and tingling of his right hand. He has been encouraged by the pain clinic to seek evaluation today to possibly see an orthopedic surgeon for this. Hydrocodone does help some, in addition to gabapentin. However, his pain is getting much worse and it is now interfering with his life. The patient was in an ATV accident 7 years ago, and he states that he had fractures that were "not repaired appropriately." He does have decreased range of motion of his wrist and fingers. He has chronic pain, especially around the base of his thumb. Secondary to the numbness and tingling, he is now having difficulty bathing himself, wiping himself, and feeding himself. His niece is helping care for him, and he has become more relia[nt] on her. Secondary to this, he is much more anxious and irritable. He states that his mood flips very quickly, and his niece agrees with this. No fevers, chills, or recent injury to his hand. No suicidal or homicidal thoughts. He continues to have panic attacks, but these are improving on Lexapro.
> . . . .
> EXTREMITIES: The patient has decreased range of motion of his right wrist compared to his left in all directions. He has some swelling over his CMC joint of his right hand and decreased grip strength. He has obvious swelling, especially of his middle finger.
> NEUROLOGIC: Decreased sensation of his right hand as compared to the left.

(Tr. at 589.) The record further reflects that "[n]ew medication and gabapentin are not making a difference at this point." (Tr. at 589.) Plaintiff was sent for evaluation by the Hand Center, which led to the examinations and surgeries discussed above. Nothing about this record reflects improvement with medication that would allow functioning beyond that assessed by Dr. Landau.

In the briefing, Defendant cites other bases for the ALJ's RFC findings. These include the State agency medical consultants' 2016 opinions that Plaintiff could perform frequent right-handed handling and fingering and x-ray results from the same year. Defendant's

14

argument it inapposite, however, as the ALJ did not rely on this evidence in assigning Dr. Landau's opinion only partial weight. As noted in <u>Anderson v. Colvin</u>, this Court's

> [r]eview of the ALJ's ruling is limited . . . by the so-called '<u>Chenery</u> Doctrine,' which prohibits courts from considering post hoc rationalizations in defense of administrative agency decisions. . . . Under the doctrine, a reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency. . . . If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."

<u>Anderson v. Colvin</u>, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. Mar. 25, 2014) (quoting <u>Sec. & Exch. Comm'n v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947)).

Moreover, even absent <u>Chenery</u> concerns, the findings cited by the Commissioner would not account for the issues noted above or provide substantial evidence to support the decision here. In terms of the State agency opinions, the ALJ assigned them little weight and relied more heavily on Dr. Landau's opinions, which were based "upon a thorough physical examination," and subsequent evidence which indicated a need for greater restrictions. (Tr. at 23-24.) As for the x-rays of Plaintiff's hands and wrists, the ALJ noted that Plaintiff's January 2016 right hand x-ray "showed flexion deformity of the right fingers" (Tr. at 22, 424), which is consistent with Plaintiff's testimony and his later CT results. That the x-rays also showed "no underlying bony abnormalities" in the right hand and "only 'mild' degenerative changes at the carpometacarpal junction" (Tr. at 22, 424, 425) has little bearing on limitations resulting from Plaintiff's prior injury, nor are the x-ray findings inconsistent with the CT findings, which provide a greater degree of detail and clarity.

In sum, the ALJ failed to properly consider the effects of Plaintiff's right hand injury, either separately or in conjunction with the effects of his carpal tunnel syndrome, in finding

15

him capable of performing frequent, right-handed handling and fingering. As Plaintiff correctly asserts, this failure is significant, as the vocational expert testified that if Plaintiff were limited to occasional, rather than frequent, handling and fingering, he would be unable to perform any jobs in the national economy. (Tr. at 76.) Accordingly, the Court concludes that remand is required so that the ALJ can provide specific reasons, supported by the evidence in the case record, for each limitation described in the RFC assessment, particularly Plaintiff's handling and fingering limitations.[8]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11] should be

---

[8] Given this recommended remand, the Court need not reach Plaintiff's additional contention, that the ALJ failed to properly account for Plaintiff's functional illiteracy when identifying his education level, as this matter can be raised for further consideration before the ALJ. The Court notes, however, that Plaintiff testified that he could not read or write, that he could not make change, that he never obtained a driver's license because he could not read the test, that he had never filled out a job application, and that his niece filled out any forms or paperwork for him. (Tr. at 40, 43-44, 58-59, 61-63, 65, 67-69, 258.) The record reflects that his health care providers also noted his inability to read and write. (Tr. at 622.) His school records reflect that he was in school through 10th grade, but with failing grades (Tr. at 249-50), and Defendant reported he was in Special Education classes (Tr. at 40, 260). The initial denial at the administrative level reflected application of the framework for "Young Illiterate" (Tr. at 91, 103.) The ALJ did not discuss this issue, but at step five the ALJ classified Plaintiff as an individual with "limited education." (Tr. at 24.) Plaintiff contends that the ALJ failed to provide any reasoning for this determination, and also notes that the jobs identified by the vocational expert, particularly Clerk Cashier and Document Clerk, could not be performed by an individual who could not read or write and could not perform basic math such as making change. In response, Defendant argues that the ALJ had a sufficient basis for finding Plaintiff was of "limited education" rather than "illiterate" and that the position of Inspector would still be available in any event. However, it appears that these are matters that should be addressed and resolved by the ALJ, with assistance from the VE as needed, specifically as to whether Plaintiff is or is not functionally illiterate, and if so, whether or the extent to which that would impact the availability of jobs identified by the vocational expert. The Court need not consider that issue further, as it can be addressed by the ALJ in the first instance in light of the remand recommended above.

Case 1:19-cv-00536-NCT-JEP Document 15 Filed 09/11/20 Page 16 of 17

GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 11th day of September, 2020.

                                          /s/ Joi Elizabeth Peake
                                      United States Magistrate Judge